Opinion issued November 25, 2009









 




 





In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00971-CV






MONZER HOURANI AND CARLTON PARK OWNER'S ASSOCIATION,
INC., Appellants


V.


JONATHAN KATZEN, Appellee






On Appeal from the 190th District Court

Harris County, Texas

Trial Court Cause No. 2005-04491






O P I N I O N


 In this suit for declaratory relief, which concerns a dispute over restrictive
covenants in a residential subdivision, appellants, Monzer Hourani and Carlton Park
Owner's Association, Inc. ("Hourani"), challenge the trial court's rendition of
summary judgment in favor of appellee, Jonathan Katzen. 

 In six issues, Hourani contends that the trial court erred by (1) declaring
Section 2.4(o) of the deed restrictions invalid, (2) not finding that Katzen was barred
by the doctrines of estoppel and waiver from challenging Section 2.4(o) of the
restrictions, (3) granting relief beyond that requested in Katzen's motion for summary
judgment, (4) awarding attorney's fees that were inequitable and unjust, (5)
disregarding the construction pre-approval process set out in the restrictions at
Section 2.2, and (6) appointing a Special Master without "good cause."

 We affirm.

BACKGROUND

 Carlton Park is a residential subdivision in Harris County comprised of 11
acres, divided into 9 lots, each abutting Carlton Park Street. Hourani owns Lots 1
through 5; Michael Urban and Barbara Duganier own Lot 6; Katzen owns Lot 7;
Mool and Kim Nigam own Lot 8; and Lucy Cruce owns Lot 9. A lake extends across
the front portions of Lots 7 and 8.

 Calton Park became, at its inception in 1984, governed by a "Declaration of
Covenants, Conditions, and Restrictions" ("Restrictions"). The purpose of the
Restrictions was to "create and carry out a general and uniform plan for the
improvement, development, sale and use of Lots . . . in the Subdivision." The
Restrictions provided that they were to be administered by the "Carlton Park Owner's
Association" ("Association") through a Board of Directors ("Board"). 

 Section 2.1 of the Restrictions provides that, "[e]ach Owner shall use his
Lot . . . for single family residential purposes only."

 Section 2.2 requires the written approval of the Board prior to the construction
of any building or improvement. 

 Section 2.4(o) specifies that "[n]o building or other structure or improvement
shall be constructed within the lake located on a portion of Lot 7 and a portion of Lot
8, or within fifteen (15) feet of the edges of such Lake, without the prior approval of
the Board."

 Section 2.6(g) grants the owners of Lots 7 and 8 reciprocal easements for the
exclusive use of the lake, as follows:

 Reciprocal easements of use and enjoyment are hereby granted in favor
of the Owners of Lots 7 and 8 with respect to the lake located on a
portion of Lot 7 and a portion of Lot 8 (the "Lake"), such that the Owner
of Lot 7 shall be entitled to reasonably use and enjoy the surface of the
Lake within the boundaries of Lot 8 (but not the Lake bottom or
shoreline or any other portion of Lot 8), and the Owner of Lot 8 shall be
entitled to reasonably use and enjoy the surface of the Lake within the
boundaries of Lot 7 (but not the Lake bottom or shoreline or any other
portion of Lot 7). Nothing contained in this Section 2.6(g) or elsewhere
is this Declaration shall be construed as granting or bestowing rights of
use and enjoyment of the Lake to any party other than the Owners of
Lots 7 and 8 as provided for in this Section 2.6(g).



 Section 2.7 provides that the lake is the sole property of the owners of Lots 7
and 8 and that the Carlton Park Owner's Association ("Association") disclaims any
rights or ownership in the lake, as follows:

 The Lake located on a portion of Lot 7 and a portion of Lot 8 is the sole
property of the respective Owners of such Lots as shown on the Plat and
Declarant and Association hereby disclaim any property rights or
ownership interest in the Lake and further disclaim any obligation of
maintenance of security with regard thereto. Maintenance of the Lake
shall be the joint responsibility of the Owners of Lots 7 and 8 . . . . 


 In 1989, the Association, a nonprofit corporation, "forfeited existence," having
failed to pay its franchises taxes to the Secretary of State.

 Katzen purchased Lot 7 in 1993. The deed provides that Katzen accepted the
conveyance "subject to any and all restrictions, liens, covenants, conditions and
easements, if any, relating to [the property], but only to the extent they are still in
effect." The lot remained unimproved until 2004, when Katzen contracted with
Sprouse House Custom Homes to build a single family residence on the lot. 

 Lot 7 is surrounded, on the sides and rear, by property owned by others. The
lake extends almost completely across the front of Lot 7. Hence, a narrow path of
approximately 15 feet, situated between the eastern edge of the lake and the eastern
boundary line of the property, provides the only street access to the dry portion of the
lot behind the lake. There is also a 15-foot setback (1) line along the eastern boundary
line, which comes near to or touches the edge of the lake. Katzen sought to either
build a bridge over the edge of the lake or to obtain a variance to pour a driveway.

 Katzen was granted a special variance from the City of Piney Point Village to
build "a driveway/bridge" within 15 feet of the edge of the lake and within the
setback zone. The record shows that the City concluded that Katzen would be
allowed to construct "an engineered driveway/bridge" along the eastern edge of the
property. (2) 

 Because the Association had "forfeited existence," Katzen submitted his
construction plans to the other property owners in the subdivision. Urban and
Duganier responded by letter that they disapproved of the plans; Hourani responded
by letter that, if Katzen moved forward with his plans, Hourani would sue. 

 On January 19, 2005, Katzen sued Hourani, Urban, Duganier, the Nigrams, and
Cruce, alleging that the Restrictions were preventing him from accessing his property.
Katzen sought declaratory relief from the trial court, as well as attorney's fees. 
Katzen expressly identified his suit as a declaratory judgment action brought under
the Uniform Declaratory Judgments Act. See Tex. Civ. Prac. & Rem. Code Ann.
§ 37.001-.011 (Vernon 2008) ("DJA"). (3) 

 On October 28, 2005, Katzen moved for summary judgment, seeking a
declaration that the Restrictions were invalid to the extent that they prevented him
from accessing his property. To support his motion, Katzen attached as evidence
various documents and affidavits, which are discussed in detail below.

 On November 1, 2005, Katzen supplemented his motion for summary
judgment, seeking a declaration that this case be deemed "exceptional," under Rule
of Civil Procedure 171, in that Hourani "arbitrarily and capriciously" sought to
prevent Katzen from obtaining access to his property, and asking that the trial court
appoint a special master with a background in engineering to make a binding decision
with regard to the means and implementation of reasonable access to Lot 7. 

 On December 27, 2005, in their response to the motion for summary judgment,
Urban, Duganier, and Cruce (4) contended that fact issues precluded summary judgment,
namely, the lack of engineering testing and structural studies of the lake and soil
necessary to support Katzen's contention that his proposed access was safe.

 On December 29, 2005, in his response to Katzen's motion for summary
judgment, Hourani contended that Katzen was not entitled to summary judgment
because Katzen had failed to submit any plans for approval; Katzen's proposed
driveway or bridge would damage the lake; Katzen had failed to establish that the
restrictions should be invalidated; Katzen had offered no evidence that the restrictions
were "arbitrary, capricious, or discriminatory"; "Katzen offered no evidence that the
Lake could not be preserved or that the owners had abandoned the Lake-related
restrictions"; and that Katzen had failed to prove that he was entitled to an easement
by necessity.

 To support his motion, Hourani attached as evidence various documents and
affidavits, which are discussed in detail below.

 On February 15, 2006, in his reply to Hourani's response, Katzen asserted that,
pursuant to the Restrictions, Hourani did not have any right to "use and enjoyment"
of the lake.

 On April 6, 2006, Hourani obtained reinstatement of the Association by the
Secretary of State. The Association then intervened in this suit.

 Also in April 2006, the trial court asked the parties to submit the names of
proposed engineering experts to serve as master. Urban, Duganier, and Cruce
submitted a proposal that Eric C. Green, Professional Engineer, be appointed to serve
as master. On April 20, 2006, the trial court ruled, "In accordance with Rule 171 and
the parties' recommendations, the Court appoints Eric C. Green, P.E., as a special
master on the engineering issues in this case." The court later ordered that Green's
fees be split equally amongst each of the homeowners and the Association.

 In his report, Green indicates that he found that "[t]he construction of a
driveway along the pond side of the berm, with some filling of the pond adjacent to
the berm, is the most reasonable location concerning engineering and construction
limitations posed by the site." In addition, based on his review, Green stated that "the
construction of the driveway along the edge of the pond will increase the stability of
the existing berm, and will not impact the watertight integrity of the pond."

 On October 15, 2007, after a hearing, the trial court granted a "Final Summary
Judgment" in favor of Katzen, declaring, as follows:

 1. That Section 2.4(o) of the "Declaration of Covenants, Conditions,
and Restrictions for Carlton Park" recorded at . . . is declared
invalid only to the extent such Restriction prevents the property
owner from access to Lot 7 . . . . 

 2. That the Master's Report of Findings dated August 29, 2007 is
hereby adopted by the Court and incorporated by reference in this
Judgment.

 3. That [Katzen] or his designee shall have the right to access Lot 7
of the Subdivision by construction of a driveway in conformance
with the Report of Findings of the Master dated August 29, 2007. 
Further, that [Katzen] or his designee shall submit the
construction plans of the driveway to the Special Master to
confirm their conformance with the Report of Findings.

 4. Intervenor or any reconstructed or formed Carlton Park
Homeowners Association or Board of Directors is hereby bound
by this Judgment.

 5. That [Hourani] take nothing by his counterclaim against [Katzen].

 6. That pursuant to Tex. Civ. Prac. & Rem. Code 37.009 [Hourani]
pay [Katzen] the sum of $38,251.25 for attorney fees incurred by
[Katzen].

 7. That [Hourani] pay [Katzen] the additional sum of $25,000 for
attorney fees in the event this case is successfully appealed to the
court of appeals and the additional sum of $10,000 in the event
this case is successfully appealed to the Texas Supreme Court.

 8. That all costs for the Master shall be split between the parties as
previously agreed by the parties. All other costs shall be taxed
against [Hourani].

 9. The court denies all relief not granted in this judgment. This
judgment finally disposes of all parties and claims. Hourani filed a "Motion to Reconsider and/or New Trial," which was
overruled. This appeal by Hourani ensued.

ANALYSIS

 In six issues, Hourani contends that the trial court erred by (1) declaring
Section 2.4(o) of the deed restrictions invalid, (2) not finding that Katzen was barred
by the doctrines of estoppel and waiver from challenging Section 2.4(o) of the
restrictions, (3) granting relief beyond that requested in Katzen's motion for summary
judgment, (4) awarding attorney's fees that were inequitable and unjust, (5)
disregarding the construction pre-approval process set out in the restrictions at
Section 2.2, and (6) appointing a Special Master without "good cause."

Appointing a Special Master

 In his sixth issue, Hourani contends that the trial court erred by appointing a
special master without "good cause." Specifically, Hourani contends that, although
the trial court stated in its order that it was acting in accordance with Rule 171, it
failed to recite in its order "any explanation as to how this case fits the criterion of
Rule 171." Hourani directs us to Simpson v. Canales for support. 806 S.W.2d 802,
810 (Tex. 1991).

 The appointment of a master lies within the sound discretion of the trial court
and should not be reversed except for a clear abuse of that discretion. Id. at 811. 
Rule of Civil Procedure 171, which governs the appointment of a special master,
provides, in relevant part:

 The court may, in exceptional cases, for good cause appoint a master in chancery, . . . who shall perform all of the duties required of him by the
court, and shall be under orders of the court, and have such power as the
master in chancery has in a court of equity. 


Tex. R. Civ. P. 171 (emphasis added). The "exceptional case" and "good cause"
standards are "not susceptible [to] precise definition." Simpson, 806 S.W.2d at 811.
Although the trial court may consider the complexity of the case, the rule's standards
may not be satisfied merely by showing that a case is time-consuming or complicated.
Id.

 In Simpson, the trial court appointed a master based on the complexity of the
toxic-tort case before it, which involved one plaintiff and 18 defendants. Id. Over the
course of 10 months, 8 discovery motions were filed, but the trial court did not hear
any of the pending discovery disputes before appointing the master. Id. The supreme
court concluded that the appointment of the master constituted a clear abuse of
discretion by the trial court because, although the case may have been more
complicated than others on the trial court's docket, it could "hardly be said to be
exceptional, at least at this point in its development." Id. The supreme court
explained that "[e]ven if this were an exceptional case, based upon the allegations in
the pleadings, the number of parties, or the amount of activity it generated, we would
be reluctant to approve the trial court's delegation of the supervision of all discovery
to be conducted in the case to the master." Id. at 811-12.

 Here, Katzen moved for the appointment of a special master to assist the trial
court with the complex issues of soil stability and lake retention. The trial court
asked the parties to submit the names of proposed engineering experts to serve as
master. Urban, Duganier, and Cruce proposed that Eric C. Green, P. E., be appointed.
The trial court's order states, "In accordance with Rule 171 and the parties'
recommendations, the Court appoints Eric C. Green, P.E., as special master on the
engineering issues in this case." In its final judgment, the trial court states that it
found that good cause existed to appoint a professional engineer as a Master
in Chancery pursuant to Tex. R. Civ. P. 171. The Court, by order dated
April 20, 2006, appointed Eric C. Green, P.E. as Master to provide a
report recommending the engineering design for the access to the
property.


 Unlike Simpson, the record before us supports the trial court's conclusion that
this is an "exceptional case" and that "good cause" existed for supervision by a
master. See Simpson, 806 S.W.2d at 811-12 (reviewing record for required support). 
The highly technical nature of the case, which involves the feasibility of constructing
a driveway or bridge along the edge of a lake without damaging the lake, and the
assistance which may be provided to the trial court by a special master with
engineering training and expertise constitutes a sufficiently exceptional condition to
justify the present appointment. See Transamerican Natural Gas Corp. v. Mancias,
877 S.W.2d 840, 843 (Tex. App.--Corpus Christi 1994, orig. proceeding); see also
Texas Bank and Trust Co. v. Moore, 595 S.W.2d 502, 510-11 (Tex. 1980).

 We conclude that the trial court did not abuse its discretion by appointing a
master.

 Accordingly, Hourani's sixth issue is overruled.

Summary Judgment

A. Standard of Review

 Katzen sought relief under the Uniform Declaratory Judgments Act. Tex. Civ.
Prac. & Rem. Code Ann. § 37.001-.011 (Vernon 2008). Texas Rule of Civil
Procedure 166a states, in pertinent part, that a party seeking to recover on a
declaratory judgment may, at any time after the adverse party has appeared or
answered, move with or without supporting affidavits for a summary judgment in his
favor upon all or any part thereof. Tex. R. Civ. P. 166a(a).

 Declaratory judgments rendered by summary judgment are reviewed under the
same standards as govern summary judgments generally. Bowers v. Taylor, 263
S.W.3d 260, 264 (Tex. App.--Houston [1st Dist.] 2007, no pet.). We review a trial
court's granting of a traditional summary judgment de novo. Provident Life &
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003). A summary judgment
under Rule of Civil Procedure 166a(c) is properly granted only when a movant
establishes that there are no genuine issues of material fact and that he is entitled to
judgment as a matter of law. Tex. R. Civ. P. 166a(c); KPMG Peat Marwick v.
Harrison County Hous. Fin., 988 S.W.2d 746, 748 (Tex. 1999). A plaintiff moving
for summary judgment must prove that he is entitled to summary judgment as a matter
of law on each element of his cause of action. MMP, Ltd. v. Jones, 710 S.W.2d 59,
60 (Tex. 1986); Rizkallah v. Conner, 952 S.W.2d 582, 582 (Tex. App.--Houston [1st
Dist.] 1997, no pet.). In deciding whether there is a disputed material fact precluding
summary judgment, evidence favorable to the non-movant will be taken as true, every
reasonable inference must be indulged in favor of the non-movant, and any doubts
resolved in its favor. Knott, 128 S.W.3d at 215. The movant must conclusively
establish its right to judgment as a matter of law. See MMP, Ltd., 710 SW.2d at 60. 
A matter is conclusively established if reasonable people could not differ as to the
conclusion to be drawn from the evidence. City of Keller v. Wilson, 168 S.W.3d 802,
816 (Tex. 2005).

B. The Restrictions

 In his first issue, Hourani contends that the trial court erred by declaring
Section 2.4(o) invalid. In his fifth issue, Hourani contends that the trial court
erroneously directed "that any plans be submitted to the Master, instead of the Board
as required by Restriction 2.2." Hourani contends that "Sections 2.2 and 2.4(o) are
plain and unambiguous and thus, must be enforced as written." We will address
these related points together.

 1. "Preemptive violation" of Section 2.2

 Hourani first contends that, by its summary judgment, the trial court necessarily
disregarded the pre-construction approval process mandated by Section 2.2 of the
Restrictions. Conversely, Katzen contends that he was not required to seek Board
approval because the Association had forfeited its charter and that there was no Board
in existence to grant or withhold the approval of his construction plans, citing Texas
Property Code section 204.011. See Tex. Prop. Code Ann. § 204.011 (Vernon Supp.
2009). 

 In granting summary judgment in favor of Katzen, the trial court struck through
the language in the judgment regarding invalidation of the pre-approval Restriction,
Section 2.2, as it concerned the "construction of the access and the Katzen residence,"
pursuant to Property Code sections 204.0011(b) and (c). Hence, the trial court did not
expressly declare Section 2.2 invalid on the basis of Property Code section 204.011. 

 We address this point, nevertheless, because Hourani complains on appeal that
the trial court implicitly disregarded the pre-approval process mandated by Section
2.2 when it declared Section 2.4(o) invalid and that "Katzen's entire challenge is
predicated on his preemptive violation of the restrictions." The analysis of his point
is governed by Property Code section 204.011(c)(3). See id.

 Section 2.2 mandates, in pertinent part, "No building or improvement of any
kind shall be erected, placed, constructed, maintained or altered on any portion of the
Land until the Plans for such building or improvement have been submitted to and
approved in writing by the Board . . . ." 

 In his petition, Katzen asserted that he was not required to seek Board approval
because the Association had forfeited its charter and that there was no Board in
existence to grant or withhold the approval of his construction plans. Katzen
contended that Section 2.2, which required him to seek approval from a body that no
longer existed as a precondition to construction, effectively prohibited him from
making use of his property. Katzen stated that, in the absence of a Board or
Association, his builder, Sprouse, submitted the construction plans to all of the
property owners in the subdivision. Sprouse received letters from Hourani (the owner
of Lots 1-5) and Urban and Duganier (the owners of Lot 6), stating that they did not
approve of the driveway. Hourani threatened to sue Katzen if construction
commenced. Katzen sought a declaratory judgment that the restrictions requiring pre-approval of construction plans by an entity that was not in existence at the time the
suit was filed, were invalid.

 In his motion for summary judgment, dated October 28, 2005, Katzen asserted
that he was entitled to summary judgment because, as a matter of law, there was no
Board in existence, as the Association had ceased to exist as a legal entity, pursuant
to Property Code Section 204.011 and Anderson v. New Property Owners'
Association of Newport, 122 S.W.3d 378, 389 (Tex. App.--Texarkana 2003, writ
denied) (holding that property owners' association not in existence at time of suit had
no authority to enforce pre-approval restriction regarding driveway construction).

 Katzen appended to his motion, as evidence pertinent to this point, certified
copies of the subdivision plat and his deed; the Restrictions; the letter and
construction plans sent by Sprouse to the property owners; the letters received from
Hourani and Urban/Duganier; and a certification from the Office of the Secretary of
State, reflecting that the Association had "forfeited existence" and had been inactive
since 1989.

 In his response, Hourani contended, as pertinent to this issue, that "Katzen and
Sprouse failed to submit any plans for approval . . . ." Hourani also contended that,
because he was personally entitled to enforce a restrictive covenant, "the issue of the
approval of the Board is irrelevant." Hourani attached, as evidence to support his
response, the following: the Restrictions; the Lot 7 deed; Sprouse's letter to
homeowners regarding the proposed construction; the Urban/Duganier letter to
Sprouse; the Association's certificate of incorporation and its by-laws; notice of an
annual meeting; minutes from a 1994 Board meeting; and the affidavit of engineer
Richard Gay and that of Hourani. 

 In his own affidavit, Hourani attested that Katzen failed "to provide the
Association with design, drawings and specifications by registered professional
engineers and hydrologic engineers . . . ." (Emphasis added.) Gay attested that 

 [t]he construction of a bridge such as the one suggested by Katzen and
Sprouse with its proximity to the lake and the dam would have the
potential to damage the lake if not properly designed. . . . Improper
design and/or construction could result in leakage which could
substantially impair the aesthetic functionality of the lake.

 The conceptual layout of the bridge as depicted on the site plan and the
perspective is not sufficient to make a determination regarding the
adequacy of the bridge design with regard to safeguarding the integrity
of the existing lake. In order to make such a determination, detailed
plans and specifications with respect to the proposed bridge would need
to be provided by the owner or builder and his/their engineer . . . . An
evaluation of such plans and specifications could then be made by
qualified professionals with specific knowledge of structural and
geotechnical engineering.


 Section 2.2 expressly mandates that a property owner is not permitted to
undertake any construction "until the Plans for such building or improvement have
been submitted to and approved in writing by the Board." (Emphasis added.) The
Board is the sole entity provided in the Restrictions with architectural control over
the subdivision. See Tex. Prop. Code Ann. § 204.011(a) (Vernon Supp. 2009). 
Property Code Section 204.011 provides that the authority of an architectural control
committee, that is, as here, vested by virtue of the Restrictions in the property owners'
association, will expire when, inter alia, the property owners' association "ceases to
exist." See id. § 204.011(c)(3). 

 The record shows, and it is undisputed, that the Association, a non-profit
corporation which had failed to pay its franchise taxes to the Secretary of State, had
"forfeited existence" fifteen years prior to 2004--when Katzen sought to build his
driveway access to Lot 7. When a corporation forfeits its charter, it forfeits its right
to do business and is dissolved. See Tex. Bus. Corp. Act Ann. art. 7.12A, F
(Vernon 2003) (explaining that dissolved corporation may not continue its corporate
existence for purpose of continuing business or affairs for which it was organized);
Emmett Props., Inc. v. Halliburton Energy Servs., Inc., 167 S.W.3d 365, 369 (Tex.
App.--Houston [14th Dist.] 2005, pet. denied). 

 Once a corporation pays delinquent taxes and is reinstated, the payment relates
back and revives the corporate rights that were forfeited. See Tex. Tax Code Ann.
§ 171.312; Halliburton, 167 S.W.3d at 369; Mello v. A.M.F., Inc., 7 S.W.3d 329, 331
(Tex. App.--Beaumont 1999, pet. denied) (stating that if corporation files its
delinquent reports and pays its delinquent franchise taxes, its corporate privileges and
charter are retroactively reinstated); Bluebonnet Farms, Inc. v. Gibraltar Sav. Ass'n,
618 S.W.2d 81, 85 (Tex. Civ. App.--Houston [1st Dist.] 1980, writ ref'd n.r.e.). 
Generally, an entity is afforded three years from the date of dissolution to cure its
corporate status, before it begins to lose certain rights. See Halliburton, 167 S.W.3d
at 369.

 We need not determine the effect of any retroactive reinstatement or limitations
in this case, however. The record shows that the Association "forfeited existence"
in 1989 and was not reinstated April 4, 2006. Hence, in 2004, when Katzen sought
to begin construction of his driveway, he could not have complied with Section 2.2,
which required the written approval of an entity that had forfeited its existence. See
Anderson, 122 S.W.3d at 389-90 (concluding that property owner not required to
seek approval for construction of driveway from homeowners' association that lacked
authority under section 204.011).

 We recognize that, notwithstanding the status of the Board, any person entitled
to benefit under a restrictive covenant is entitled to enforce it. See Ski Masters of
Tex., L.L.C. v. Heinemeyer, 269 S.W.3d 662, 668 (Tex. App.--San Antonio 2008, no
pet.). Hence, here, any one or more of the property owners could have compelled
Katzen to seek pre-approval of the Board, in accordance with Section 2.2, had it
existed. Nothing in the Restrictions, however, requires Katzen to submit certain plans
to, or obtain written approval from, each of the individual property owners in the
subdivision, in the absence of a board.

 We conclude that the trial court did not err by disregarding a "preemptive
violation" of Section 2.2.

 2. Section 2.4(o)

 Next, Hourani contends that the trial court erred by declaring Section 2.4(o)
invalid. Specifically, Hourani contends that, as in any other contract, the language
in a restriction must be construed in accordance with the intention expressed by the
language therein. See Herbert v. Polly Ranch Homeowners Ass'n, 943 S.W.2d 906,
907-08 (Tex. App.--Houston [1st Dist.] 1996, no writ). Hourani contends that the
trial court lacked authority to "alter, modify, or invalidate the Restriction--as such
action was tantamount to rewriting the parties' contract." 

 Restrictive covenants are subject to the general rules of contract construction.
City of Pasadena v. Gennedy, 125 S.W.3d 687, 692 (Tex. App.--Houston [1st Dist.]
2003, pet. denied). Words used in a restrictive covenant may not be enlarged,
extended, stretched, or changed by construction. Wilmoth v. Wilcox, 734 S.W.2d 656,
657 (Tex. 1987); Pebble Beach Prop. Owners' Assoc. v. Sherer, 2 S.W.3d 283, 288
(Tex. App.--San Antonio 1999, pet. denied). Rather, words and phrases used in the
covenant must be given their commonly accepted meaning. Wilmoth, 734 S.W.2d at
657. 

 In construing a restrictive covenant, the court's primary task is to determine the
intent of its framers. See Tex. Prop. Code Ann. § 202.003(a) (Vernon 2007) ("A
restrictive covenant shall be liberally construed to give effect to its purposes and
intent."); Wilmoth, 734 S.W.2d at 657; Wilchester W. Concerned Homeowners LDEF,
Inc. v. Wilchester W. Fund, Inc., 177 S.W.3d 552, 563 (Tex. App.--Houston [1st
Dist.] 2005, pet. denied); Samms v. Autumn Run Comty. Improvement Ass'n, 23
S.W.3d 398, 402 (Tex. App.--Houston [1st Dist.] 2000, pet. denied). Covenants
restricting the free use of land are not favored by the courts, but when they are
confined to a lawful purpose and are clearly worded, they are generally enforceable.
Wilmoth, 734 S.W.2d at 657. "All doubts must be resolved in favor of the free and
unrestricted use of the premises, and the restrictive clause must be strictly construed
against the party seeking to enforce it." Highlands Mgmt. Co. v. First Interstate
Bank, 956 S.W.2d 749, 753 (Tex. App--Houston [14th Dist.] 1997, pet. denied); see
Ashcreek Homeowner's Ass'n v. Smith, 902 S.W.2d 586, 588-89 (Tex.
App.--Houston [1st Dist.] 1995, no writ) (explaining that Property Code section
202.003 does not does not conflict with doctrine that restrictive covenants be
construed either to favor free and unrestricted use of land or against party seeking
enforcement). 

 Section 2.4(o) specifies that "No building or other structure or improvement
shall be constructed within the lake located on a portion of Lot 7 and a portion of Lot
8, or within fifteen (15) feet of the edges of such Lake, without the prior approval of
the Board."

 It is undisputed that Section 2.4(o) unambiguously prohibits the construction
of any improvement within the lake or within 15 feet of its edge. We construe an
unambiguous deed restriction as a matter of law. Am. Golf Corp. v. Colburn, 65
S.W.3d 277, 280 (Tex. App.--Houston [14th Dist.] 2001, pet. denied). The trial
court's judgment reflects that it "declared invalid" Section 2.4(o) "only to the extent
such Restriction prevents the property owner from access to Lot 7." 

 In his motion for summary judgment, Katzen contended that his lot is useless
for any purpose if the Restrictions are applied to preclude him from access to his lot. 
As his evidence, pertinent to this point, Katzen attached a certified copy of the plat;
a certified copy of Katzen's deed; a map of Lots 7 and 8; and a certified copy of the
Restrictions. The plat shows Lot 7 abutting Carlton Park Street. The map reflects the
position of the lake across the front of Lot 7, and a 15-foot setback line along the
property boundary that touches the edge of the lake. The summary judgment
evidence shows that Lot 7 is land-locked on three sides and that its only means of
ingress and egress to Carlton Park Street is over the 15-foot strip of land that lies
between the lake and the property boundary. Katzen obtained a variance from Piney
Point Village to build in the setback zone. However, Section 2.4(o) prohibits the
construction of any improvement in the same 15-foot space because it also lies within
15 feet of the edge of the lake.

 We construe section 2.4(o) liberally to give effect to its purposes and intent,
resolve all doubt in favor of the free and unrestricted use of the premises, and strictly
construe the provision against Hourani, who seeks enforcement. See Tex. Prop.
Code Ann. § 202.003(a); Highlands Mgmt. Co., 956 S.W.2d at 753; Smith, 902
S.W.2d at 588-89.

 First, the drafters' stated purpose in the Restrictions was to "create and carry
out a general and uniform plan for the improvement, development, sale and use of
Lots . . . in the Subdivision." Section 2.1 of the Restrictions provides that, "Each
Owner shall use his Lot . . . for single family residential purposes only." Hence, first
and foremost, the intent of the drafters was to create a residential subdivision, each
lot to be improved and developed as a single family residence.

 By purchasing Lot 7 in Carlton Park subdivision, pursuant to a recorded plat
depicting that Lot 7 abuts Carlton Park Street, Katzen has, as a matter of law, a right
of ingress and egress along Carlton Park Street. "Abutting property owners have
private rights in existing streets and alleys in addition to their rights in common with
the general public." GAR Assocs. III, L.P. v. State ex rel. Tex. Dept. of Transp., 224
S.W.3d 395, 402 (Tex. App.--Houston [1st Dist.] 2006, no pet.) (citing City of San
Antonio v. Olivares, 505 S.W.2d 526, 530 (Tex. 1974)). "This right is in effect a
private right of ingress and egress and is a right of passageway to and from the
property." Id. "Conveyance of land by reference to a map or plat, upon which lots and
streets are laid out, results in the purchaser or one holding under him, acquiring by
implication a private easement in the alleys or streets shown on the plat." Id.; see also
Town of Palm Valley v. Johnson, 17 S.W.3d 281, 288 (Tex. App.--Corpus Christi
2000, pet. denied) ("A private easement in a street may be acquired either as a
purchaser in a subdivision with reference to a recorded plat or map . . . or as an
abutting property owner.")). 

 Liberally construing Section 2.4(o), which specifies that "[n]o building or other
structure or improvement shall be constructed within the lake located on a portion of
Lot 7 and a portion of Lot 8, or within fifteen (15) feet of the edges of such Lake,"
the obvious intent of the drafters was to prohibit the building of a home directly on
the lake, or a dock within the lake, because Lots 7 and 8 share reciprocal easements. 
It belies logic that the developers of the nine-lot residential subdivision intended,
when they drafted Section 2.4(o), to render one of those lots worthless as a residential
building site. 

 Hourani contends that "the undisputable and legitimate purpose and intent of
the Restriction is to preserve the beautiful lake, its appearance, and the ambiance and
value it provides to the Piney Point and Carlton Park neighborhoods and residents."

 Section 2.7, however, provides that the lake is the sole property of the owners
of Lots 7 and 8, and that the Association expressly disclaims any rights, ownership,
or obligations with regard to the lake, as follows:

 The Lake located on a portion of Lot 7 and a portion of Lot 8 is the sole
property of the respective Owners of such Lots as shown on the Plat and
Declarant and Association hereby disclaim any property rights or
ownership interest in the Lake and further disclaim any obligation of
maintenance of security with regard thereto. Maintenance of the Lake
shall be the joint responsibility of the Owners of Lots 7 and 8 . . . . (Emphasis added.) Further, Section 2.6(g) expressly excepts any party, other than the
owners of Lots 7 and 8, from having any rights of use or enjoyment in the lake, as
follows:

 Reciprocal easements of use and enjoyment are hereby granted in favor
of the Owners of Lots 7 and 8 with respect to the lake located on a
portion of Lot 7 and a portion of Lot 8 (the "Lake"), such that the Owner
of Lot 7 shall be entitled to reasonably use and enjoy the surface of the
Lake within the boundaries of Lot 8 (but not the Lake bottom or
shoreline or any other portion of Lot 8), and the Owner of Lot 8 shall be
entitled to reasonably use and enjoy the surface of the Lake within the
boundaries of Lot 7 (but not the Lake bottom or shoreline or any other
portion of Lot 7). Nothing contained in this Section 2.6(g) or elsewhere
is this Declaration shall be construed as granting or bestowing rights
of use and enjoyment of the Lake to any party other than the Owners of
Lots 7 and 8 as provided for in this Section 2.6(g).


(Emphasis added.) In his response to the motion for summary judgment, Hourani appended as his
evidence, the Restrictions; the Lot 7 deed; Sprouse's letter to homeowners regarding
the proposed construction; the Urban/Duganier letter to Sprouse; the Association's
certificate of incorporation and its by-laws; notice of an annual meeting; minutes
from a 1994 Board meetinghis own affidavit and that of Gay. 

 Hourani attested that any construction of a driveway or bridge "in the area" will
damage the lake. Gay attested that 

 [t]he construction of a bridge such as the one suggested by Katzen and
Sprouse with its proximity to the lake and the dam would have the
potential to damage the lake if not properly designed. . . . Improper
design and/or construction could result in leakage which could
substantially impair the aesthetic functionality of the lake.

(Emphasis added.)

 The issue before us is not whether there are genuine issues of material fact with
regard to the method of construction of the driveway itself or whether it would
damage the lake. Rather, the issue Hourani has placed before us is the propriety of
the trial court's judgment invalidating Section 2.4(o) to the extent that it denies
Katzen all access to his property. 

 Hourani offered no summary judgment evidence that raises a genuine issue of
material fact with regard to whether Section 2.4(o) denies Katzen all access to Lot 7. 
We conclude that Hourani did not meet his summary judgment burden to raise a
genuine issue of material fact. 

 In a subissue, Hourani contends that the Property Code section 202.004
mandates that the Restriction "is presumptively reasonable--unless and until the
evidence proves otherwise" and that Katzen failed to rebut the presumption through
evidence that the Restriction is "arbitrary, capricious or discriminatory." See Tex.
Prop. Code Ann. § 202.004 (Vernon 2007). Property Code section 202.004, which
governs "[a]n exercise of discretionary authority by a property owner's association
or other representative" does not apply to any exercise of discretion by individual
property owners. See Jacks v. Bobo, No. 12-07-00420-CV, 2009 WL 2356277, at
*7 (Tex. App.--Tyler July 31, 2009, pet. denied). Further, it is undisputed that there
has been no exercise of discretionary authority by the Association in this case.

 Finally, Hourani, inconsistently, contends that he does not deny that Katzen is
entitled to some form of access, but that Section 2.4(o) "simply requires Board
approval for any plan to build a structure or improvement within the lake or 15 feet
of its edges."

 The trial court's judgment reflects that it expressly adopted the Master's Report
of Findings; declared that Katzen have access to Lot 7 by construction of a driveway
in conformance with the Master's report; and declared that Katzen was required to
submit the construction plans of the driveway to the Special Master for approval. 

 The trial court's judgment was signed October 15, 2007. The record shows that
Hourani had successfully reinstated the Association with the Secretary of State on
April 4, 2006. Hence, at the time of the trial court's judgment, the Association was
restored; however, the trial court did not order Katzen to re-submit his driveway plans
to the Association.

 The record shows that Katzen's plans had already been submitted to all of the
property owners and that their positions had been established. The trial court was not
required to order Katzen to perform the futile act of resubmitting his plans to the
Association, which is governed by the same individuals and would likely have left
Katzen in the position of having to restart his lawsuit. See City of Houston v. Kolb,
982 S.W.2d 949, 954 (Tex. App.--Houston [14th Dist.] 1999, pet. denied)
(concluding that property owner not required to resort to piecemeal litigation to
obtain final determination when it was clear town would not approve variance
requested). 

 Accordingly, Hourani's first and fifth issues are overruled.

C. Granting Relief Beyond that Requested

 In his third issue, Hourani contends that the trial court erred by granting relief
beyond that requested by Katzen's motion for summary judgment.

 Hourani contends that, by his motion for summary judgment, Katzen

 requested an Order declaring that he or his designee be granted the right
to access Lot 7 by building the bridge . . . ; however, the trial court
entered the Final Summary Judgment Order declaring that Katzen had
the right to access Lot 7 via the Special Master's proposed driveway. . . .
Accordingly, the trial court erroneously granted relief which Katzen had
not requested in his Motion.


 A motion for summary judgment must stand or fall on the grounds expressly
presented in the motion. Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex.
1996). A trial court errs in granting more relief than was requested. Inglish v. Union
State Bank, 945 S.W.2d 810, 811 (Tex. 1997).


 In his motion, Katzen expressly requested a summary judgment declaring, "[t]o
the extent that the Restrictions are interpreted to deny access to, or the use and
enjoyment of, his property, the Restrictions are invalid." Katzen stated, "[A]n
examination of Exhibits A and B demonstrate that there is only one reasonable way
for Katzen to access his property, which is to place a driveway on the far east side of
the lake, which was the solution Katzen proposed."

 The trial court granted summary judgment declaring that 

 1. That Section 2.4(o) of the "Declaration of Covenants, Conditions,
and Restrictions for Carlton Park" recorded at . . . is declared
invalid only to the extent such Restriction prevents the property
owner from access to Lot 7 . . . . 

 2. That the Master's Report of Findings dated August 29, 2007 is
hereby adopted by the Court and incorporated by reference in this
Judgment.

 3. That [Katzen] or his designee shall have the right to access Lot 7
of the Subdivision by construction of a driveway in conformance
with the Report of Findings of the Master dated August 29, 2007. 
. . . . (Emphasis added.) 

 Hence, the record shows that the trial court's summary judgment was based on
grounds presented in the motion. We conclude that the trial court did not err.

 Accordingly, Hourani's third issue is overruled.

No-evidence Motion for Summary Judgment: Estoppel and Waiver

 In his second issue, Hourani contends that the trial court erred by granting
summary judgment in favor of Katzen because Katzen was barred by the doctrines of
estoppel and waiver from challenging Section 2.4(o) of the restrictions.

 Katzen moved for both no-evidence and traditional summary judgments as to
Hourani's defenses of estoppel and waiver.

 After an adequate time for discovery, the party without the burden of proof may
move for a no-evidence summary judgment, with or without presenting evidence, on
the basis that there is no evidence to support an essential element of the non-moving
party's claim. Tex. R. Civ. P. 166a(i). A no-evidence motion for summary judgment
is essentially a motion for a pre-trial directed verdict. Mack Trucks, Inc. v. Tamez, 206
S.W.3d 572, 581-82 (Tex. 2006). Once the motion is filed, the burden shifts to the
nonmoving party to present evidence raising a genuine issue of material fact as to the
elements specified in the motion. Id. at 582. "We review the evidence presented by
the motion and response in the light most favorable to the party against whom
summary judgment was rendered, crediting evidence favorable to that party if
reasonable jurors could, and disregarding contrary evidence unless reasonable jurors
could not." Id. "The court must grant the motion unless the respondent produces
summary judgment evidence raising a genuine issue of material fact." Tex. R. Civ.
P. 166a(i). If the non-movant brings forward more than a scintilla of evidence that
raises a genuine issue of material fact, then summary judgment is not proper.
Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp., 994 S.W.2d 830,
834 (Tex. App.--Houston [1st Dist.] 1999, no pet.). More than a scintilla exists when
the evidence rises to a level that would enable reasonable and fair-minded people to
differ in their conclusions. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706,
711 (Tex. 1997).

 1. Estoppel

 In his motion for no-evidence summary judgment, Katzen asserted that there
is no evidence to support an element of Hourani's estoppel defense. 

 Quasi-estoppel precludes a party from asserting, to another's disadvantage, a
right inconsistent with a position previously taken. Lopez v. Munoz, Hockema &
Reed, LLP, 22 S.W.3d 857, 864 (Tex. 2000). Hourani contends that Katzen took his
deed with knowledge of the Restrictions and that, because he previously owned the
lot behind Lot 7, Katzen purchased Lot 7 with the intent to keep anyone from
building on it. Hourani contends that all of the property owners in Carlton Park
depended on such position when they built their homes.

 Katzen contends that there is no evidence that he had knowledge when he
purchased Lot 7 that the Restrictions would be interpreted in a way that would
preclude all access to the lot and that there is no evidence that he intended to never
build on Lot 7. 

 Hourani's summary judgment evidence does not address Katzen's knowledge
in this regard or present any evidence of an intent by Katzen to relinquish his rights. 
Hence, Hourani failed to meet his burden to present evidence raising a genuine issue
of material fact as to the element specified in Katzen's motion. See Tamez, 206
S.W.3d at 582. Hence, summary judgment was proper on this point.

 2. Waiver

 In his motion for no-evidence summary judgment, Katzen asserted that there
is no evidence to support an element of Hourani's waiver defense.

 The elements of waiver are: (1) an existing right, benefit, or advantage; (2)
actual or constructive notice of its existence; (3) an actual intent to relinquish that
right. Tenneco Inc. v. Enterprise Products Co., 925 S.W.2d 640, 643 (Tex. 1996). 
Ordinarily, the issue of waiver is a question of fact. Id. When, however, facts are
clearly established and are undisputed, waiver becomes a question of law. Id.

 Here, Katzen asserts that there is no evidence that he had actual or constructive
knowledge that the Restrictions would be interpreted to deny him all access to Lot 7
or that he intentionally relinquished his rights in that regard.

 Hourani's summary judgment evidence does not address Katzen's knowledge
in this regard or show anything that demonstrates an intent to relinquish his rights. 
Hence, Hourani failed to meet his burden to present evidence raising a genuine issue
of material fact as to the elements specified in Katzen's motion. See Tamez, 206
S.W.3d at 582. We conclude that summary judgment is proper on this point.

 Accordingly, Hourani's second issue is overruled.


Attorney's Fees

 In his fourth issue, Hourani contends "that the trial court's award of attorney's
fees and costs to Katzen was/is inequitable or unjust" and that the assessment of the
award against only Hourani, to the exclusion of the other defendants, is likewise
inequitable or unjust.

 Pursuant to Civil Practice & Remedies Code section 37.009, the trial court may
award costs and reasonable and necessary attorney's fees as are equitable and just. 
Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (Vernon 2008). We review the trial
court's award of attorney's fees under an abuse of discretion standard, subject to the
requirement that fees awarded must be reasonable and necessary, which are matters
of fact, and to the additional requirements that fees be equitable and just, which are
matters of law. Everest Exploration, Inc. v. URI, Inc., 131 S.W.3d 138, 144 (Tex.
App.--San Antonio 2004, no pet.). The trial court has broad discretion to determine
whether to grant costs and attorney's fees under the DJA, and we will not reverse that
judgment on appeal absent a clear showing of abuse. Oake v. Collin County, 692
S.W.2d 454, 455 (Tex. 1985). We view the evidence in the light most favorable to
the trial court's ruling. Id.

 Here, Katzen sued all of the property owners--Hourani, Urban/Duganier,
Cruce, and the Nigrams. The trial court awarded Katzen $38,251.25 in attorney's
fees solely against Hourani.

 Hourani contends that there is "no basis" for the trial court's conclusion that
the attorney's fees were equitable and just. In addition, Hourani contends that "there
is no evidence in the Record which indicates, much less demonstrates, that Hourani,
alone, vagrantly and unreasonably attempted to restrain Katzen." 

 In his motion for summary judgment, Katzen asserted that, of all the
defendants, only Hourani has actively opposed Katzen's right to any access to his
property. In Katzen's affidavit, which he appended to his motion summary judgment
as evidence, he attested that "[the Nigrams], the owners of Lot 8, did not make any
objection to any plans for access to my lot"; "[Urban and Duganier], the owners of
Lot 6, did object to the plans but did not assert that I was not entitled to access my
lot"; "In a letter dated September 16, 2004, [Hourani] through counsel threatened to
sue me and attempt to obtain an injunction in the event that I attempted to access my
lot." In his affidavit, Sprouse attested to the same facts. Katzen attached to his
motion the letters from Urban/Duganier and Hourani, and the affidavits of his counsel
attesting to the reasonable and necessary attorney's fees incurred by Katzen.

 In his response to the motion for summary judgment, Hourani did not address
attorney's fees.

 In their response to the motion, defendants Urban, Duganier, and Cruce
"agree[d] that [Katzen] should be allowed reasonable access to his property" and were
amenable to the appointment of the Master to resolve the access issue. The record
shows that Katzen did not seek attorney's fees against the other defendants. Hence,
the trial court's award of awarding attorney's fees solely against Hourani did not
constitute an abuse of discretion.

 Accordingly, Hourani's fourth issue is overruled.

CONCLUSION


 We affirm the judgment of the trial court. 

 






 Laura Carter Higley 

 Justice


Panel consists of Justices Jennings, Higley, and Sharp.





1. " " " 
 
 
 -- 
2. 
 
 
 - 
 
3. 
 
 
 
 
 
 §  
4. '